UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
UNITED STATES OF AMERICA,

            -against-

SHANNON DOZIER,

            Defendant.
------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
23-CR-00472 (OEM)

**ORELIA E. MERCHANT, United States District Judge:**

Defendant Shannon Dozier ("Defendant" or "Dozier") is charged in a one-count indictment of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Dozier now moves pursuant to Fed. R. Crim. P. 12(b)(3)(C) to suppress all tangible evidence, including but not limited to a .380 pistol and eight bullets, seized in connection with what Defendant contends was an illegal stop, frisk, and arrest of Defendant.

For the following reasons Defendant's motion is **GRANTED**.

## BACKGROUND

This case arises out of an interaction between Defendant and New York City Police Department ("NYPD") officers in the early morning hours on September 28, 2023. At that time, Officer George Gouvousis ("Gouvousis") of the NYPD was working a midnight shift along with a partner, Sergeant Miguel Cruz ("Cruz"), "addressing the burglary and car break-in issue that we were having in the precinct." Suppression Hearing Transcript ("Tr.") at 10:10-11:13. Gouvousis and Cruz were in their police vehicle when they received report on a radio run[1] of a larceny in progress on the corner of Ashlnd and Lafayette in Brooklyn, New York. *Id*. at 13:9-12. The radio run conveyed that the purported larceny in progress was "at Lafayette Avenue and Ashland Place,

---

[1] At the suppression hearing officer Gouvousis testified that "a radio run is a job that we receive over our radio from our dispatcher." Tr. 13:14-15.

the intersection. It was a black Honda Pilot, attempted to being stolen. They gave a brief description of a male black with a black jacket and black jeans." *Id*. at 13:16-21. Shortly thereafter, Gouvousis received two other descriptions on the corresponding ICAD report[2]: first that the subject was "WRNG BLCK – JNS" and next that he was "WRNG BLCK JCKT === JNS." Government Exhibit 4 at 4. In "approximately one or two minutes," Gouvousis and Cruz drove to the intersection of Lafayette Avenue and Ashland Place, the location of the call. Tr. at 19:18-20.

The interaction between the NYPD officers and Defendant was captured on Gouvousis' body-worn camera. *See generally* Government Exhibit 2. Upon arriving at the intersection of Lafayette Avenue and Ashland Place, Gouvousis stepped out of his vehicle and saw Defendant, wearing light blue jeans, a light green-and-white patterned hoodie, white sneakers, a hat, and headphones, standing by the open driver's seat door of a black Honda Pilot. *Id*. at 1:01. Dozier was conversing with a female passenger sitting inside the car in the passenger's seat. *Id*. Gouvousis approached Defendant and said, "What's up boss?" *Id*. Defendant turned to face Gouvousis, turning counterclockwise, and then faced his back against the open door of the vehicle. *Id*. at 1:04. Gouvousis asked, "We got a call—is this your car?" *Id*. The officers stepped closer to Defendant, standing in front of the space between the open door and the driver's side of the car. *Id*. at 1:05. Defendant replied, "Nah it's not my car." *Id*. Gouvousis asked Defendant "Whose car is it?" *Id*. Defendant replied, "She went that way," gesturing to the street behind the NYPD officers. *Id*. at 1:07. Gouvousis asked "Huh," to which Defendant replied again "She went that way." *Id*. at 1:08.

---

[2] Office Gouvousis explained that an "ICAD" is "is the basic general breakdown of the job that we receive on our phones." *See* Tr. at 18:17-20.

Gouvousis then asked, "Who?," to which Defendant replied, "The owner of the car." *Id*. at 1:10. Gouvousis asked, "Do you know her?" *Id*. at 1:13. Defendant replied incredulously "Yeah, of course I know her" and laughed. *Id*. at 1:14. Gouvousis replied, "Ok, because we got a call that's why we're here." *Id*. at 1:16. Defendant replied, "Oh no, it's not like that bro." *Id*. at 1:18. When the officers again stated that they had received a call, Defendant reiterated that "it's not like that that." *Id*.

The officers again asked "So who's the owner of the car," to which Defendant again replied "she went that way," gesturing again in the same direction. *Id*. at 1:25. Gouvousis asked "Is she coming back?" *Id*. at 1:26. Defendant replied "Yeah, she definitely is—she was mad, she walked off because…" *Id*. at 1:27. As Defendant trailed off, Gouvousis interjected, asking, "What happened?" *Id*. at 1:32. Defendant mumbled something unintelligible before reiterating that "it's not like that bro." *Id*. at 1:40.

Gouvousis asked Defendant if he "had ID on you," to which Defendant replied, "Nah I ain't got ID," then "I got ID on my [unintelligible]." *Id*. at 1:48. Defendant then told the officers "she went that way because, you know how girls are," pausing and trailing off. *Id*. at 1:54. At around this time, Defendant moved a phone he was holding in his right hand to his left hand, revealing what appeared to be a key fob in his right hand. *Id*. Gouvousis asked, "Is that your girl or something like that?" *Id*. at 1:56. Defendant paused and the female passenger laughed from inside the car. *Id*. at 2:00. Defendant stammered and said repeatedly said "don't do me like that, bro." *Id*. at 2:03.

Shortly thereafter, Gouvousis placed his hand on Defendant's right arm and turned Defendant to face the officers, saying "face forward," asking if he "had anything on" him, and stating that he didn't "like how you're leaning that way." *Id*. at 2:31. During the course of the

3

interaction between Defendant and the officers, Defendant had stood with his back to the open car door behind him, turning his head at an angle to address the officers. *See generally id*. The officers stood close to Defendant near the space between the open car door and the driver's side of the black Honda Pilot. *See generally id*.

Gouvousis patted down the left side of Defendant's hip, then placed him in handcuffs. *Id*. at 2:40. At this point, Gouvousis heard a second description from dispatch of the subject of the earlier 911 call, reporting that the subject was wearing blue jeans and a black jacket. *Id*. at 2:48. Gouvousis then discovered a handgun on Defendant's person and placed him under arrest. *Id*.

## DISCUSSION

### A. Terry Stop

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8–9 (1968) (quoting U.S. Const. amend. IV). In *Terry*, the Supreme Court held that a brief investigative stop of an individual does not violate the Fourth Amendment where a police officer has a reasonable suspicion that criminal activity "may be afoot." *Id*. at 30.

"That is, the police may make a *Terry* stop 'when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.' At minimum, '[t]he officer [making a *Terry* stop] ... must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.' That is, '[p]olice must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest].' 'Reasonable suspicion is an objective

4

standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant.'" *Floyd v. City of New York*, 959 F. Supp. 2d 540, 567 (S.D.N.Y. 2013) (cleaned up). The Government bears the burden of establishing that a purported *Terry* stop did not violate the Fourth Amendment. *See United States v. Calvente*, 722 F.2d 1019 (2d Cir. 1983).

As an initial matter, the Court must determine at what point Defendant was seized by the police officers. "A seizure of the person within the meaning of the Fourth Amendment occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003). "Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Fla. v. Bostick*, 501 U.S. 429, 434 (1991) (cleaned up).

The Government contends that the officers were standing far enough away from Defendant that he "was in no way boxed in," leaving a path through which Defendant could have walked away from the encounter. Government's Memorandum of Law in Opposition ("Opp"), ECF 28 at 3. However, the video footage of the encounter belies this assertion: with Gouvousis standing to the immediate right of Defendant, Cruz standing in the center in front of Defendant, the car door blocking Defendant's exit from the back, and the black Honda Pilot blocking Defendant's path to the left, Defendant would have had to push past the officers to exit the space he was standing in. The Government further argues that the vague nature of the questioning posed to Defendant— which the Government notes the Court characterized as "cutesy"—rendered the encounter "non-

5

accusatory" and "non-threatening." *Id*. at 3-4. However, the Government strips the Court's "cutesy" characterization of its context: though the Court finds the officers' questions to be "cutesy" in the sense that they were vague and predictably generated vague answers, the Court does not find the questioning posed by the officers to be sufficiently "non-accusatory" to, considered in the totality of the circumstances, lead a reasonable person in Defendant's place to believe he was free to simply walk away.

Here, the Court finds that Defendant was seized at the very beginning stages of the interaction between officers and Defendant. Upon their approach, the officers positioned themselves close to Defendant and blocked off his only point of egress, the opening between the car door and the driver's side of the black Honda Pilot. The officers then engaged in a rapid-fire questioning of Defendant, repeatedly invoking a call they had received, all the while boxing Defendant in to the space between the door and the vehicle. A reasonable person in Defendant's place would not feel free to disregard the officers' questioning and brush past them to walk away.

Accordingly, Defendant was seized from near the very beginning of his interaction with the officers.

The Court must next determine whether the Government can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion" on Defendant's liberty. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 567 (S.D.N.Y. 2013). The Government contends that Gouvousis had a reasonable, articulatable suspicion of criminal activity based on: (1) a "spike in recent neighborhood crime;" (2) the "very late time of night;" (3) the descriptions of the vehicle, location, and suspect conveyed to the officers; (4) Defendant's "furtive movements;" and (5) Defendant's "evasive" answers to the officers' questioning. Opp. at 6-10.

6

Considering the totality of the circumstances, however, the Court finds none of these purported rationales availing. Upon arriving at the scene of the call, Gouvousis found Defendant wearing clothing that bore no resemblance to the description Gouvousis had received on the radio or the ICAD report: instead of a black jacket and black jeans (or alternatively a "BLCK JCKT === JNS"), Defendant was wearing light blue jeans, a distinctive green-and-white patterned hoodie, and no jacket. Defendant was also wearing an array of other distinctive items that were not mentioned in the description, including a hat, headphones, a large white tag on his jeans, and bright white sneakers. There was no appearance of illegality at the scene, where Defendant seemed to be engaged in casual conversation with a female passenger who indicated no distress and laughed as the officers asked Defendants questions about his romantic relationship with the car owner. What appeared to be a car key was visible in Defendant's hand at times during the stop prior to the frisk.

The Government's description of Defendant's purported evasiveness is contradicted by the video footage of the encounter. What the Government characterizes as ominous "blading" appears to be a natural positioning of Defendant's body: Defendant stood with his back to the open car door at an angle where he faced all three of the other individuals present, including the passenger in the car to his far left.

Likewise, what the government characterizes as "evasive" answering reflects more the quality of questions asked by Gouvousis than furtiveness indicative of illegality. Defendant faced imprecise questioning and gave imprecise answers: though Defendant repeatedly answered "she went that way" when asked who the owner of the car was, these answers do not stand out as "evasive" given that Defendant was never asked the owner's name or description. Instead, Gouvousis asked if the owner was Defendant's "girl," drawing laughter from the female passenger

7

and a "don't do me like that" from Defendant. Defendant's reticence to state whether he was in a romantic relationship with the car owner in front of the laughing female passenger is not suggestive of illegality.

In a letter dated August 8, 2024, the Government contended that the identification from the radio run and ICAD report was on its own sufficient to justify a *Terry* stop. August 8, 2024, Letter, ECF 28 at 11. In support, the Government cites *United States v. Patterson*, 25 F.4th 123 (2022) and *United States v. Bold*, 19 F.3d 99, 103 (2d Cir. 1994), two cases where the Second Circuit found reasonable suspicion based on a match between Defendants' vehicle and location and the corresponding descriptions relayed to the arresting officers from 911 calls. August 8, 2024, Letter at 12-13. However, this precedent is not instructive here: unlike in *Patterson* or *Bold*, where identifying descriptions of clothing were not relayed to officers, Defendant's clothing here conflicted in entirety with the descriptions relayed to Gouvousis and the other circumstances surrounding the encounter did not suggest illegality.

Simply put, the circumstances of the stop did not suggest illegality and ran counter to the radio run's description of potential criminal activity by a man in a black jacket and jeans. Considering the totality of the circumstances, officers did not have a reasonable suspicion that Defendant was engaged in illegal activity. Because the evidence obtained pursuant to the officers' stop of Defendant is "fruit of the poisonous tree," it must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

## CONCLUSION

For the reasons explained above, Defendant's motion to suppress is granted. Accordingly, all tangible evidence, including but not limited to a .380 pistol and eight bullets, seized in connection with the stop, frisk, and arrest of Defendant is hereby suppressed.

**SO ORDERED.**

/s/ Orelia E. Merchant
ORELIA E. MERCHANT
United States District Judge

Dated:	August 16, 2024
	Brooklyn, New York